**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

GULED HASSAN DURAN (ISN 10023),

            Petitioner,

          v.

DONALD J. TRUMP, *et al.*,

            Respondents.

Case No. 16-cv-2358 (RBW)

---

**MOTION FOR SUMMARY RELEASE FROM DETENTION
<u>UNDER THE 2001 AUTHORIZATION FOR USE OF MILITARY FORCE</u>**

Petitioner, by and through his undersigned counsel, respectfully submits this motion for summary release from detention under the Authorization for Use of Military Force ("AUMF"), Pub. L. 107-40, 115 Stat. 224 (2001). The Court has authority to dispose of this habeas case summarily "as law and justice require," 28 U.S.C. § 2243, and should exercise that authority to order Petitioner's release because the AUMF, as informed by the laws of war, did not extend to Somalia at any time relevant to this case, and did not authorize Petitioner's capture or detention. The Court should grant the requested relief now to hasten and affect Petitioner's release from Guantanamo after twenty-two years in U.S. custody without charge, trial, or continuing need. The parties have met and conferred, and Respondents reserve their position until they have reviewed the motion. The motion should be granted.[1]

## INTRODUCTION

Respondents contend Petitioner has been lawfully detained for more than twenty years pursuant to the AUMF. The AUMF authorizes only "necessary and appropriate force" against Al Qaeda, the Taliban and other individuals and groups responsible for the September 11, 2001 attacks. AUMF § 2(a). It does not authorize unlimited force. It also does not authorize force against individuals or groups the government claims are terrorists but have no connection to the September 11, 2001 attacks. *See* Richard F. Grimmett, *Authorization for Use of Military Force in Response to the 9/11 Attacks (P.L. 107-40): Legislative History*, CRS Report for Congress (Jan. 16, 2007) (explaining Congress rejected an earlier version of the AUMF that would have authorized the President to use force to "deter and pre-empt any future acts of terrorism or

---

[1] Respondents object to Petitioner filing this motion now, and have stated they will move to adjourn their response. Petitioner objects to the Court delaying consideration of this motion, which would cause significant additional delay that the D.C. Circuit has indicated would be unwarranted. *See* Order, *In re: Guled Hassan Duran*, No. 26-5151 (D.C. Cir. June 18, 2026).

aggression against the United States" unrelated to the September 11th attacks). Nor does the AUMF explicitly authorize detention.

In *Hamdi v. Rumsfeld*, the Supreme Court held detention authority under the AUMF may be inferred from the qualified force authorization in accordance with the traditional laws of war. The Court held the AUMF authorizes the detention of individuals within the "narrow circumstances" of that case—a detainee who fought against the United States, on the battlefield in Afghanistan, as part of the Taliban—because such detention is "so fundamental and accepted an incident to war as to be an exercise of the 'necessary and appropriate force' Congress has authorized the President to use." 542 U.S. 507, 518, 519 (2004). The Court held detention is authorized under AUMF until the end of hostilities for the limited purpose of preventing a detainee from returning to battlefield and taking up arms once again. *See id.* at 518, 519. The Court based its decision on "long-standing law of war principles" related to the detention of combatants, and noted military detention of such individuals is recognized by "universal agreement and practice" as "important incidents of war." *Id.* at 518, 521. However, the Court also cautioned detention may last "no longer than active hostilities," *id.* at 520, and detention authority also may unravel as the nature of the conflict changes and becomes more unlike those that informed the development of the traditional laws of war. *See id.* at 521 ("If the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war, that understanding may unravel."). But the Court concluded "[i]f the record establishes that United States troops are still involved in active combat in Afghanistan," Respondents' detention authority continues. *Id.*

The *Hamdi* Court thus concluded that detention authority under the AUMF is informed by the laws of war. *See* 542 U.S. at 519-20; *see also Hamdan v Rumsfeld*, 548 U.S. 557, 594-95

(2006) (assuming "the AUMF activated the President's war powers"). Respondents have also conceded their authority to detain alleged members of Al Qaeda at Guantanamo Bay is constrained by the laws of war. *See* Resp'ts' Mem. Regarding the Gvt's Detention Authority Relative to Detainees Held at Guantanamo Bay at 1, *In Re Guantanamo Bay Detainee Litigation*, No. 08-mc-442 (TFH) (D.D.C. Mar. 13, 2009) (dkt. no. 1689) ("Gvt. Detention Authority Mem.") ("Principles derived from law-of-war rules governing international armed conflicts, therefore, must inform the interpretation of the detention authority Congress has authorized for the current armed conflict."); *see also Al-Bihani v. Obama*, 619 F.3d 1, 55 n.1 (D.C. Cir. 2010) (statement of Senior Circuit Judge Williams regarding the denial of en banc review, noting the government has acknowledged international law "illuminate[s] the outer bounds of the authority conferred by the [AUMF]" and how the statute should be interpreted).

In this motion, Petitioner contends that while the language of the AUMF is silent as to where Respondents are authorized to use "necessary and appropriate" force, the laws of war impose geographic constraints on their authority to use military force against alleged members of Al Qaeda, and, consequently, their inferred authority to capture and detain such individuals is likewise limited geographically. Petitioner contends—and the U.S. government has long conceded—the AUMF does not authorize global warfare. The world is not a battlefield on which an individual may be subject to force, in any country, based solely on their alleged status as a member of Al Qaeda. Whether a particular use of force falls within the scope of the armed conflict with Al Qaeda and is therefore authorized by the AUMF depends on the context.

Petitioner further contends the facts and circumstances surrounding a particular use of force must show a direct connection or nexus to an area of active hostiles (or "hot" battlefield) with Al Qaeda to ensure the particular use of force qualifies as an act of war. It is necessary for a

targeted individual's conduct to indicate involvement in active combat activities to show that person is engaged in a war against the United States and satisfy the legal requirements for armed conflict. The U.S. government has contended that force is authorized by the AUMF outside an area of active hostilities if the target of the force is an Al Qaeda leader, who is continuously planning attacks and poses an imminent threat to the United States, from an area where Al Qaeda has a significant and organized presence.

Under either approach, Petitioner's capture and detention were not authorized by the AUMF. *See Salahi v. Obama*, 625 F.3d 745, 747 (D.C. Cir. 2010) (detention under AUMF must be lawful "at the time of capture"). Two decades ago, neither the United States nor Al Qaeda had any significant, sustained presence in Somalia. Petitioner also does not satisfy the government's criteria to determine whether AUMF-authorized force may be used against an alleged member of Al Qaeda outside an area of active hostilities. Respondents do not argue Petitioner was an Al Qaeda leader who presented a continuing and imminent threat at the time of his capture or that his conduct indicated his involvement in active combat activities. In addition, the President did not make any determination within his constitutional authorities that the United States was at war in Somalia until years after Petitioner's capture and detention. Petitioner's habeas petition should be granted accordingly.

## ARGUMENT

For the laws of war to apply, a war, or armed conflict, must exist. Respondents claim the United States is involved in armed conflict with Al Qaeda, and is authorized by the AUMF to use necessary and appropriate force against Al Qaeda. Respondents also claim Petitioner's detention is lawful because he was a member of Al Qaeda at the time of his capture. Petitioner disputes the allegation. Petitioner also contends even if he were a member of Al Qaeda at that time, which he

was not, his capture and detention were not authorized by the AUMF because the United States was not involved in armed conflict with Al Qaeda in Somalia at any time relevant to him.

There are two principal types of armed conflict—international and non-international—from which different rights and protections flow to persons impacted by the conflict. *Hamdan v. Rumsfeld*, 548 U.S. 557, 628-32 (2006). An international armed conflict exists whenever two nation-states resort to armed force against one another, even if one party denies the existence of a state of war. *See* Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, art. 2, 6 U.S.T. 3316 ("Third Geneva Convention"); Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, art. 2, 6 U.S.T. 3516 ("Fourth Geneva Convention"); Int'l Comm. of the Red Cross, *Commentary on Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field* at 32 (Prictet ed. 1994) ("ICRC Commentary"). Non-international armed conflicts, by contrast, include conflicts that are not international armed conflicts waged between nation-states, but reach a threshold of violence that exceeds mere "internal disturbances and tensions" such as riots or sporadic violence. ICRC Commentary at 32; Protocol Additional to the Geneva Conventions of 12 August 1949 and Relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, art. 1(2), 16. I.L.M. 1442 ("Additional Protocol II"). Intermittent or isolated acts of terrorism are not sufficient to establish the existence of a non-international armed conflict. *See* Nathalie Weizmann, *The End of Armed Conflict, the End of Participation in Armed Conflict, and the End of Hostilities: Implications for Detention Operations Under the 2001 AUMF*, 47.3:1 Colum. Hum. Rts. L. Rev. 204, 209-19 (2016) (discussing the definition and scope of non-international armed conflicts). In addition, the only provision of the Geneva Conventions that applies to non-international armed conflicts is Common Article 3 of the

Geneva Conventions, which sets forth a minimum baseline of human rights protection to individuals impacted by the conflicts. *Hamdan*, 548 U.S. at 631.

## I.   GEOGRAPHIC LIMITATIONS ON AUMF-AUTHORIZED USE OF FORCE IN NON-INTERNATIONAL ARMED CONFLICT

The existence of non-international armed conflict is a fact-intensive legal determination under international law that requires a finding of (1) the existence of organized armed groups that (2) are engaged in protracted, large-scale violence that exceeds mere sporadic violence and internal disturbances. This definition was established in *Prosecutor v. Tadic*, Case No. IT-94-1AR72, ¶ 70 ICTY App. Chamber Oct. 2, 1995) ("*Tadic*"), and is part of customary international law. In addition, where this threshold for non-international armed conflict is met, the laws of war apply "to the whole territory under the control of a party, whether or not actual combat takes place there." *Tadic*, ¶ 70. Unlike international armed conflicts that take place across the territories of all state parties to the conflict, Common Article 3 expressly applies to non-international armed conflicts "occurring in the territory of one of the High Contracting Parties." Non-international armed conflicts accordingly have not extended beyond the borders of the one state in which it occurs.

In *Hamdan v. Rumsfeld*, the Supreme Court held that the United States is involved in a non-international armed conflict with Al Qaeda. *See* 548 U.S. at 628-31. While the Court did not address the geographic boundaries of the conflict with Al Qaeda, it necessarily concluded the conflict was not strictly limited to the borders of a single state in which the parties were engaged in active hostilities—specifically, Afghanistan. The Court's decision was consistent with an emerging consensus that non-international armed conflicts may "spill over" from one state (such as Afghanistan) to neighboring countries (such as Pakistan) when a state's military forces may pursue non-state actors fleeing across borders or other territorial boundaries. *See* Int'l Comm. of

the Red Cross, *32nd International Conference of the Red Cross and Red Crescent, Report on International Humanitarian Law and the Challenges of Contemporary Armed Conflicts* at 15, 18-19, No. 32IC/15/11, Oct. 2015 ("ICRC 2015 Report"), https://www.icrc.org/sites/default/files/document/file_list/32ic-report-on-ihl-and-challenges-of-armed-conflicts.pdf. Petitioner does not challenge that position, at least for the limited purpose of litigating this motion.

However, *Hamdan* did not conclude that the United States is involved in a non-international armed conflict with Al Qaeda that extends worldwide, without any regard for borders or other territorial limitations, where an individual may be subjected to force based solely on that person's alleged status as a member of Al Qaeda, regardless of the individual facts and circumstances of who that person may be, what they may have done, or where they may be located geographically. The question remains to what extent, and under which facts and circumstances, the conflict with Al Qaeda may extend beyond areas of active hostilities (or a "hot" battlefield) such as Afghanistan.

In answering that question, Petitioner respectfully submits that non-international armed conflict cannot logically extend worldwide, and beyond areas of active hostilities, without regard to borders or other territorial boundaries. To conclude otherwise would mean that a single roving, alleged Al Qaeda member would carry with them the armed conflict and the laws of war to anywhere in the world they happen to be—including to the majority of nations which are not involved in the armed conflict. That would effectively cede authority to those alleged members of Al Qaeda to decide where and when the United States and other nations were at war. The result would have significant ramifications. It would infringe on and undermine the peacetime legal framework that ordinarily applies outside areas of active hostilities. It would allow an

alleged Al Qaeda member to turn a peacetime area into a war zone based solely on the individual's status. That could further impact the sovereignty and neutrality of other states not otherwise party to the conflict, subjecting them to war, without their consent, throughout their territories. *See* ICRC 2015 Report at 15. It could not conceivably be the case, for example, that the United States could use AUMF-authorized force throughout Switzerland, which is not an area of active hostilities against Al Qaeda, because an alleged member of Al Qaeda traveled to Zurich. The United States certainly would not accept armed force directed throughout this nation by a foreign adversary based on an individual's alleged combatant status.

Indeed, the United States has not made that claim expressly, nor has a U.S. court endorsed such a claim. *See* David A. Barron, Acting Assistant Attorney General, *Memorandum for the Attorney General re: Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar Al-Aulaqi* at 25, Office of Legal Counsel, Dep't of Justice, July 16, 2010 ("OLC Memo") ("There is little judicial or other authoritative precedent that speaks directly to the question of the geographic scope of a non-international armed conflict in which one of the parties is a transnational, non-state actor and where the principal theater of operations is not within the territory of the nation that is a party to the conflict."),
https://www.justice.gov/sites/default/files/olc/pages/attachments/2015/04/02/2010-07-16_-_olc_aaga_barron_-_al-aulaqi.pdf. Nor is there international consensus that the armed conflict with Al Qaeda extends worldwide without regard to borders or other territorial constraints. To the contrary, no state appears to accept that view of global conflict completely unbounded by borders or other territorial limitations. *See, e.g.*, Nathalie Weizmann, *A Drone Strike and the Debate on the Geography of the War Against Al-Qaeda and its Associates*, JustSecurity.org, July

14, 2025 (noting German prosecutors "expressly rejected the 'war on terror' notion that the conflict extends to any counterterrorism operation without any territorial limitation."). Rather, while the United States has argued its authority to use force under the AUMF is not strictly limited to areas of active hostilities, or "hot" battlefields like Afghanistan, it has also acknowledged that where it may exercise its AUMF authority is both constrained by the laws of war and not geographically unlimited.

As the former State Department Legal Adviser explained, the United States "has not treated the post-9/11 conflict as a Global War on Terror to which no law applies, in which the United States is authorized to use force anywhere, against anyone. Instead, it has acknowledged that its authority under domestic law derives from Acts of Congress, not just the President's vague constitutional powers. Under international law, . . . U.S. actions are constrained by the laws of war." Harold H. Koh, *How to End the Forever War?*, Oxford Union, Oxford, UK (May 7, 2013) (remarks of former State Department Legal Adviser during Obama administration).

Likewise, as the former Defense Department General Counsel explained, "there is nothing in the wording of the 2001 AUMF or its legislative history that restricts statutory authority to the 'hot' battlefield of Afghanistan. . . However, this legal conclusion too has its limits. It should not be interpreted to mean that we believe we are in any 'Global War on Terror,' or that we can use military force whenever we want, wherever we want. International legal principles, including our respect for a state's sovereignty and the laws of war, impose important limits on our ability to act unilaterally, and on the way in which we can use force in foreign territories." Jeh Johnson, General Counsel, Dep't of Defense, *National Security Law, Lawyers and Lawyering in the Obama Administration*, Yale Law School (Feb. 22, 2012).

Accordingly, when Respondents filed their detention authority memorandum in the Guantanamo detainee cases in March 2009, they argued their detention authority was not limited to the battlefields of Afghanistan, but also did not state a limiting principle in terms of where that authority extended extraterritorially. Instead, Respondents obfuscated about the outer geographic limits of its AUMF authority, stating only that their authority extends "in other parts of the world." Gvt. Detention Authority Mem, at 7. Apart a from hypothetical reference to a spill-over example of an enemy force fleeing Afghanistan into Pakistan, *see id.* at 9, where that force could "have melted into the civilian population and then regrouped to relaunch vicious attacks against U.S. forces, the Afghan government, and the civilian population," *id.* at 10, Respondents did not attempt to delineate the outer boundaries of its authority. Rather, they requested that the courts address issues concerning the scope of its detention authority on a case-by-case basis, based on their individual facts and circumstances. *See also* OLC Memo at 26 ("Rather, we think the determination of whether a particular operation would be part of an ongoing armed conflict for purposes of international law requires consideration of the particular facts and circumstances present in each case. Such an inquiry may be particularly appropriate in a conflict of the sort here, given that the parties to it include transnational non-state organizations that are dispersed and that thus may have no single site serving as their base of operations.").

The outstanding question, again, is where to draw the line in a particular case on whether the AUMF authorizes necessary and appropriate force outside an active war zone. *See also id.* at 25 (noting issue is untested in litigation and unresolved).

## II. PETITIONER'S ALLEGED CONDUCT WAS OUTSIDE THE U.S. ARMED CONFLICT WITH AL QAEDA

Petitioner contends the Court should order his summary release because the armed conflict with Al Qaeda did not involve him. Somalia was not an area of active hostilities, nor

does Petitioner's alleged conduct satisfy the criteria established by the U.S. government for the use of armed force outside war zones.

There is no dispute that at the time of Petitioner's initial capture and detention, Somalia was not an area of active hostilities, or a "hot" battlefield, for purposes of the AUMF and the conflict with Al Qaeda. *See* Prepared Statement of Stephen W. Preston, General Counsel, Dep't of Defense, The Framework Under U.S. Law for Current Military Operations, Before the Committee on Foreign Relations, U.S. Senate, May 21, 2014 (identifying Somalia as an area outside of active hostilities); *see also* Fact Sheet: Executive Order on the U.S. Policy on Pre & Post-Strike Measures to Address Civilian Casualties in the U.S. Operations Involving the Use of Force & the DNI Release of Aggregate Data on Strikes Outside Area of Active Hostilities, The White House, July 1, 2016 (areas of active hostilities do not include Somalia).

Petitioner contends the conflict with Al Qaeda did not extend to Somalia at that time. There was no direct connection to or nexus between the domestic instability in Somalia in 2003 and 2004 and U.S. combat with Al Qaeda that was ongoing in Afghanistan. Notwithstanding isolated or intermittent acts of violence and terrorism in the context of domestic turmoil, Somalia was not an area of intense fighting involving the United States or Al Qaeda.

At the time of Petitioner's capture and detention, there were no U.S. forces in Somalia and Al Qaeda did not have a substantial or organized presence in the country. Any violence or conflict that occurred in Somalia around that time was so far removed from the active hostilities occurring between the United States and Al Qaeda that the use of force against an alleged Al Qaeda member, based solely on that person's conduct, could not fairly be considered an act of hostilities falling within the strict legal requirements for non-international armed conflict: organized armed forces engaged in large-scale, protracted violence. *See* Sasha Radin, *Global*

*Armed Conflict? The Threshold of Extraterritorial Non-International Armed Conflicts*, 89 Int'l L. Stud. 696 (2013) ("[T]o erase territorial boundaries from the equation entirely when establishing the existence of an armed conflict raises challenges to the structure of the law [of war] and some of its underlying purposes.").

By contrast, the U.S. government has argued that in applying a context-specific approach to determining whether the use of force against an alleged member of Al Qaeda would fall within the AUMF outside an area of active hostilities, the following criteria must be met:

1. The individual to whom force will be directed is a "leader" of Al Qaeda or an associated force of Al Qaeda;

2. The use of force would occur in an area where Al Qaeda or its associated force "has a significant and organized presence";

3. And from which Al Qaeda or its associated force "is conducting terrorist training in an organized manner and has executed and is planning to execute attacks against the United States"; and

4. The targeted "individual himself, on behalf of that force, is continuously planning attacks from that" area.

OLC Memo at 27. These criteria were ostensibly intended to gauge whether a particular individual was involved in active combat operations, which the U.S. government claimed was sufficient to subject them to force under the AUMF outside of active hostilities.

In 2013, the President announced similar criteria for the use of lethal force outside of areas of active hostilities. An alleged member of Al Qaeda could be targeted with lethal force if: (1) there is "a legal basis" for targeting "a senior operational leader" or forces used to conduct an attack; (2) the individual "poses a continuing, imminent threat to U.S. persons," while

recognizing that "[i]t is simply not the case that all terrorists pose a continuing, imminent threat to U.S. persons"; and (3) the use of force is constrained and limited by principles of sovereignty and the laws of armed conflict. Again, the U.S. government looked to these criteria ostensibly to determine whether a targeted individual was engaged in warfare against the United States. Fact Sheet: U.S. Policy Standards and Procedures for the Use of Force in Counterterrorism Operations Outside the United States and Areas of Active Hostilities, The White House, May 23, 2013, https://obamawhitehouse.archives.gov/the-press-office/2013/05/23/fact-sheet-us-policy-standards-and-procedures-use-force-counterterrorism.

Petitioner does not concede the correctness of the U.S. government's analysis in this regard, nor its invocation of this analysis in other instances, including those of targeted killings outside areas of active hostilities under the AUMF, which have never been sanctioned by a court. *See also Hussain v. Obama*, 134 S. Ct. 1621 (2014) (statement of Justice Breyer respecting denial of certiorari) ("The Court has not directly addressed whether the AUMF authorizes, and the Constitution permits, detention on the basis that an individual was part of al Qaeda, or part of the Taliban, but was not 'engaged in an armed conflict against the United States' in Afghanistan prior to his capture."). But even applying that analysis for the limited purpose of this case, Petitioner did not satisfy the criteria to use force against him under the AUMF in 2003 and 2004 for at least three reasons.

First, Petitioner was not captured pursuant to armed conflict under the AUMF. He was apprehended while transiting through the airport in Djibouti to obtain medical care in Sudan, and disappeared into the CIA torture program. *See* Declaration of Petitioner Guled Hassan Duran (redacted) ("Duran Decl."), ECF No. 114-1, at 29-56. He was not detained in accordance with the laws of war during the years he was held in secret CIA detention, and was not transferred to

law-of-war custody until his transfer to Guantanamo in September 2006. Indeed, at the time of Petitioner's capture and detention, the U.S. government took the position that the United States was <u>not</u> engaged in a non-international armed conflict with Al Qaeda, and the CIA was <u>not</u> subject to Common Article 3 of the Geneva Conventions. *See* Letter from Stephen G. Bradbury, Office of Legal Counsel, Dep't of Justice, to John A. Rizzo, Acting General Counsel, CIA, Aug. 31, 2006 (explaining it had been the "longstanding position of the Executive Branch" that non-international armed conflict limited applicability of Common Article 3 to civil wars, and thus was "not applicable to the global armed conflict against al Qaeda and its allies"), https://www.thetorturedatabase.org/files/foia_subsite/22.pdf; *see also* Report of the Senate Select Committee on Intelligence Committee Study of the Central Intelligence Agency's Detention and Interrogation Program, Executive Summary at 158-59 of 499, Dec. 2014 ("SSCI Rpt.") (noting *Hamdan* was incompatible with the CIA torture program), https://www.intelligence.senate.gov/wp-content/uploads/2024/08/sites-default-filesations-crpt-113srpt288.pdf.

CIA rendition, detention and interrogation operations were not authorized by the AUMF. The AUMF authorized the use of force only by U.S. "armed forces," *i.e.*, the military. AUMF § 2(a). CIA operations were authorized by a classified Memorandum of Notification, issued by President Bush, on September 17, 2001—before the AUMF was enacted—which "provided unprecedented authorities, granting the CIA significant discretion in determining whom to detain, the factual basis for the detention, and the length of detention." SSCI Rpt. at 11 of 499. Most members of Congress also did not know about the CIA torture program or were misled about it by the CIA until September 2006. *See id.* at 5 of 19.

In the years following the September 11, 2001 attacks, the Horn of Africa was considered by the United States to be a "'Title 50 environment,' meaning it was not considered a combat theater. (Title 50 is the section of the U.S. Code dealing with covert intelligence issues, while Title 10 deals with the armed services, including clandestine military operations.)." *The Secret War: Africa Ops May Be Just Starting*, Military Times, Mar. 29, 2013, https://www.militarytimes.com/2013/03/29/the-secret-war-africa-ops-may-be-just-starting/. In Somalia, in particular, the CIA reportedly paid warlords to capture Al Qaeda suspects, though any connection between those individuals and "the rest of Al Qaeda" was "really specious" and "very frail." *Id.* (citing intelligence and military sources); *see also* Andrew McGregor, *Warlords or Counter-Terrorists: U.S. Intervention in Somalia*, Jamestown.org, May 31, 2006, https://jamestown.org/warlords-or-counter-terrorists-u-s-intervention-in-somalia/; Mark Mazzetti, *Efforts by C.I.A. Fail in Somalia, Officials Charge*, N.Y. Times, June 8, 2006, https://www.nytimes.com/2006/06/08/world/africa/efforts-by-cia-fail-in-somalia-officials-charge.html. It was a haphazard effort that ultimately caused a backlash among the Somali civilian population and eventually gave rise to Al Shabaab in early 2007. *See* Michael R. Gordon & Mark Mazzetti, *U.S. Used Base in Ethiopia to Hunt Al Qaeda*, N.Y. Times, Feb. 23, 2007, https://www.nytimes.com/2007/02/23/world/africa/23somalia.html.

Second, Al Qaeda did not have a significant or organized presence in Somalia in 2003 and 2004, and was not an area from which Al Qaeda launched attacks against the United States. Unlike Afghanistan or Pakistan, Al Qaeda failed to establish a presence in Somalia at the time. *See Al Qaida's (Mis)Adventures in the Horn of Africa* at 1, Harmony Project, Combating Terrorism Center at West Point (2010) ("[W]e find that in this region al-Qa'ida has been moderately successful when operating in weak states like Kenya but has largely failed to

establish itself in failed states like Somalia."), https://ctc.usma.edu/app/uploads/2010/06/Al-QaidasMisAdventures-in-the-Horn-of-Africa.pdf; *see also*, *e.g.*, Senior Defense Official, Department of Defense Background Briefing, Terrorist Threat in Horn of Africa, The Pentagon, Mar. 8, 2002 ("[T]here are some reasons why Somalia would not be a good place [for Al Qaeda], and one is the clan structure, the clan family. Al Qaeda members, especially foreign nationals, would tend to stick out among the Somali population, which is ethnically unique to the area . . . Somalis [also] tend to be pragmatists. If given an opportunity to turn over someone for a reward, chances are they'd take the bet. So, as stated . . . there are also reasons why Somalia is not such a good choice, especially for high-profile members" of Al Qaeda), https://2001-2009.state.gov/s/ct/rls/rm/8801.htm. There were also no associated forces of Al Qaeda in Somalia prior to the designation of Al Shabaab in December 2016. *See also* Charlie Savage et al., *Obama Expands War With Al Qaeda to Include Shabab in Somalia*, N.Y. Times, Nov. 27, 2016 ("In Somalia, the United States has long taken the position that a handful of Shabab leaders, as individuals, had sufficient ties to Al Qaeda to make them wartime targets."), https://www.nytimes.com/2016/11/27/us/politics/obama-expands-war-with-al-qaeda-to-include-shabab-in-somalia.html.

In addition, at that time there were no U.S. forces located in Somalia, no attacks directed at U.S. forces, and no U.S. casualties there. Somalia simply did not involve the sustained presence of organized armed parties or the intensity of large-scale, protracted violence to bring it within the non-international armed conflict with Al Qaeda. *See also* Mac William Bishop, *Deadly Ambush in Niger Highlights America's Growing Mission in Africa*, NBC News, Oct. 8, 2017 (as late as 2017, senior U.S. military officials stated "America is not at war in Africa"),

https://www.nbcnews.com/news/world/deadly-ambush-niger-highlights-america-s-growing-mission-africa-n808711.

Third, Respondents do not allege any facts that would indicate Petitioner was involved in active combat operations. They do not allege he was a leader of Al Qaeda or that he presented a continuing, imminent threat to the United States. Nor do they contend that he had a continuous combat function. He had been shot three months before his capture, when he was the victim of a street robbery entirely unrelated to the ostensible reasons for his capture and detention. He was gravely injured, did not leave the house, and left Somalia to obtain medical care in Sudan. *See* Duran Decl., ECF No. 114-1, at 29-56. He was also captured and disappeared into CIA detention for two years not because he had engaged in combat operations or any other purported acts of war against the United States, but rather because the CIA thought he might be able to help them locate other individuals who might be senior Al Qaeda leaders. *See* SSCI Rpt. at 339 of 499. (CIA communication stating Petitioner "represent[ed] the closest we have come to an individual with first hand, face-to-face knowledge of . . . senior al-Qa'ida members"). The CIA also wanted to recruit him as a spy, which he refused. *See* Duran Decl., ECF No. 114-1, at 29-56, ¶¶ 42, 85.

In these respects, Petitioner stands in contrast with those senior Al Qaeda leaders, who had launched attacks against the United States, and who United States targeted with lethal force beginning in January 2007. After the September 11th attacks, the CIA's initial counterterrorism efforts in Somalia failed. They caused a backlash among the Somali civilian population, which gave rise to the Islamic Courts Union that took control of Mogadishu from CIA-backed groups in June 2006. In December 2006, Ethiopia invaded Somalia, with U.S. support, to dislodge the Islamic Courts Union. This caused a further backlash, which gave rise to Al Shabaab and drew the United States into direct combat operations in Somalia in early 2007. This was the first time

the United States stated it was using force in Somalia under the AUMF. *See* Ewen MacAskill, *Somali Official Confirms Al-Qaida Target Killed in US Assault*, The Guardian, Sept. 15, 2009 (after U.S. withdrew from Somalia in 1993, "George Bush resumed limited military operations, with an attack by one of its gunships on suspected al-Qaida members in 2007."), https://www.theguardian.com/world/2009/sep/15/somalia-al-qaida-nabhan-killed; Michael R. Gordon & Mark Mazzetti, *U.S. Used Base in Ethiopia to Hunt Al Qaeda*, N.Y. Times, Feb. 23, 2007. But even then, the United States only targeted alleged senior leaders of Al Qaeda under the AUMF. *See*; Jim Garamone, *Aircraft Attack Al Qaeda Haven in Somalia*, Am. Forces Press Serv., Jan. 9, 2007 ("the strikes were aimed at al Qaeda terrorists who planned the attacks against the U.S. embassies in Kenya and Tanzania in 1998"), http://www.af.mil/News/Article-Display/Article/128457/aircraft-attack-al-qaeda-haven-in-somalia/; George W. Bush, *Letter to Congressional Leaders Reporting on the Deployments of United States Combat-Equipped Armed Forces Around the World*, June 15, 2007 (notifying Congress pursuant to the War Powers Resolution of the use of force in Somalia against "terrorists who pose a continuing and imminent threat to the United States, our friends and allies, and our forces abroad"), https://assets.ctfassets.net/6hn51hpulw83/4CtJNUkaAjhnM47GwMj5Hz/7766660490a577a1105 935409d3d72f1/P20070615-W_Bush.pdf.

The United States also thereafter targeted members of Al Shabaab, but only those members of Al Shabaab who the United States claimed were also senior Al Qaeda leaders. The limited use of force against members of Al Shabaab continued until the group was designated as an associated force in 2016. Al Shabaab was designed as an associated force because the United States needed additional authorities to justify its increasing strikes against individuals who it alleged were members of Al Shabaab but not Al Qaeda leaders. *See* Jeffrey Gettleman, *Somalis*

*Kill Mastermind of 2 U.S. Embassy Bombings*, N.Y. Times, June 11, 2011) ("In recent years, American special forces have killed other high-level Qaeda operatives in Somalia" including those who "wore two hats" as "leader[s] of Al Qaeda's franchise in East Africa and . . . for the Shabab, the Somali militant group that started as a homegrown insurgency but has steadily drawn closer to Al Qaeda and expanded its ambitions."), https://www.nytimes.com/2011/06/12/world/africa/12somalia.html; Int'l Crisis Group, *Overkill: Reforming the Legal Basis for the U.S. War on Terror* at 13, U.S. Rpt. No. 5, Sept. 17, 2021 (discussion prior to designation of Al Shabaab as an associated force of Al Qaeda in Somalia, the United States "limited its use of military force in Somalia to regimented strikes against members of Al-Shabaab whom the administration had determined also belonged to al-Qaeda's core."), https://www.crisisgroup.org/sites/default/files/005-us-counter-terrorism_1.pdf.

A final point bears emphasis regarding the U.S. non-reliance on the AUMF to conduct military operations in the context of armed conflict in Somalia prior to January 2007. There were no war powers notices issued by the President indicating that he had committed U.S. forces to hostilities or armed conflict in Somalia under AUMF at any time relevant to this case. This is important as a matter of the separation of powers. The power to declare war resides solely with Congress. *See* Const. art. I, § 8, cl. 11. Absent formal congressional declaration of war, the President may invoke Article II Commander-in-Chief authority under the Constitution to commit U.S. forces to hostilities in limited circumstances, but must report the introduction of U.S. forces into hostilities, or into the territory of a foreign nation while equipped for combat, to Congress within 48 hours under the 1973 War Powers Resolution. *See* 50 U.S.C. § 1541. These reports must include, among other information, the constitutional or legislative authority authorizing the action, as well as their duration and scope. *See id.* § 1543(a). Where Congress has authorized the

use of force, as with the AUMF, the President must provide reports at least every six months that provide the same information as the hostilities reports. *See id.* § 1543(c).

The AUMF does not alter and is not otherwise exempt from these requirements. AUMF § 2(b)(2). To the contrary, it is codified as a note to the War Powers Resolution, and incorporates the requirements that the President report its invocation to Congress at least every six months. *See* 50 U.S.C. § 1541, note, Authorization for Use of Military Force Against September 11 Terrorists; *see also* Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations at 5, The White House, Dec. 2016 (President "regularly briefs Congress about U.S. operations against these groups and the legal basis for these operations," including AUMF), https://obamawhitehouse.archives.gov/sites/whitehouse.gov/files/documents/Legal_Policy_Report.pdf.

In the case of Somalia, however, the President did not issue any war powers-related notice concerning the use of force under the AUMF until in January 2007, well after Petitioner's capture, CIA detention, and transfer to military custody at Guantanamo Bay in September 2006. *See* Stephanie Savell, *The 2001 Authorization for Use of Military Force: A Comprehensive Look at Where and How it Has Been Used* at 5 & n.8, Costs of War Project, Watson Institute, Brown University, Dec. 14, 2021, https://costsofwar.watson.brown.edu/sites/default/files/papers/Costs-of-War_2001-AUMF.pdf (listing presidential invocations of the 2001 AUMF, and noting "Bush administration failed to cite the AUMF in reference to . . . Somalia in 2003-2004 and 2008."). The absence of war powers-related notifications to Congress concerning Somalia in the years before 2007—in contrast to such notices for countries like Afghanistan—is evidence that the

U.S.-Al Qaeda armed conflict authorized by the AUMF had not spilled over to Somalia at the time of Petitioner's capture and detention.

## CONCLUSION

For all of the foregoing reasons, the Court should conclude the laws of war impose geographic limitations on the use of force under the AUMF, which did not authorize Petitioner's capture and detention. Petitioner's habeas petition should be summarily granted.

Dated:    July 31, 2026

Respectfully submitted,

/s/ J. Wells Dixon
J. Wells Dixon (Pursuant to LCvR 83.2(f))
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6423
wdixon@ccrjustice.org

Sabrina Shroff (D.D.C. Bar No. NY0481)
730 Third Avenue, 16th Floor
New York, New York 10017
Tel: (646) 763-1490
Sabrinashroff@gmail.com

*Counsel for Petitioner*

- 23 -

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2026, I caused the foregoing motion to be filed with the

Court and served on counsel for all parties via the Court's CM/ECF system.


/s/ J. Wells Dixon
J. Wells Dixon